**Katharine Ferguson ROBERTS**

v.

**Phoebe Ferguson ANDERSON, et al.**

**Civ. A. No. 88–2167.**

United States District Court,
E.D. Louisiana.

Jan. 29, 1990.

Steeg & O'Connor, Robert M. Steeg, Stephen D. Marx, New Orleans, La., for plaintiff.

Eneid A. Francis, Asst. U.S. Atty., New Orleans, La., for I.R.S. of the U.S.

Guste, Barnett & Shushan, Barry E. Pike, New Orleans, La., for Dr. Ted Reveley.

Hebert, Mouledoux & Bland, Georges M. Legrand, Alan G. Brackett, Trial Atty., New Orleans, La., for Stotler & Co.

Healy & Kohnke, George W. Healy, IV, New Orleans, La., for Thomas A. Ogg, III.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Andrew A. Braun, New Orleans, La., for George Denegre and Richard B. Fox.

Wegmann and Wegmann, Edward F. Wegmann, Cynthia Anne Wegmann, New Orleans, La., for Commanders Palace.

R. Douglas Wynne, New Orleans, La., for Galatoire's Restaurant, Inc.

Mark H. Kaplinsky, New Orleans, La., for Thompson–McKinnon Securities, Inc.

Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler & Barkley, Camilo K. Salas, III, Trial Atty., New Orleans, La., for William Loring Ferguson, III.

## ORDER AND REASONS

PATRICK E. CARR, District Judge.

This matter is before the Court on (1) the motion of Stotler and Company to withdraw funds from the registry of the Court; (2) the motion of the trustees of the William Loring Ferguson III trust to withdraw funds from the registry of the Court; and (3) the motion of Ogg for creditors to be paid in order of rank.

For the following reasons, the Court now determines that half of the remaining proceeds in the registry should be disbursed to the trustees and the remaining half should be disbursed to Loring Ferguson's creditors in the order of rank as determined by the dates they recorded their judicial mortgages in the parish mortgage records office and that the related state court case in which Loring, his trustees, and one of his creditors were parties does not bar this Court from recognizing that creditor's claim or any other creditor's claim to the instant registry proceeds.

### I.

In June 1966, William Loring Ferguson, Jr. executed his last will and testament, wherein he left all his property to separate

trusts set up for each of his three children, Katharine, Loring III, and Phoebe. The will contains in pertinent part:

Each beneficiary shall receive one-half of the corpus and accumulated income of the trust when he shall reach the age of twenty-five (25) years and shall receive the remaining one-half when he shall reach the age of thirty-five (35) years, at which time his trust shall terminate.

. . . .

The interest of the beneficiaries in the trusts shall not be subject to voluntary or involuntary alienation by such beneficiaries.

The will named Mr. Ferguson's mother and two others as cotrustees for each of the three trusts.

In 1970, Mr. Ferguson died. Among the property in his estate was his naked ownership, subject to his surviving mother's usufruct, in a family home in New Orleans. On April 8, 1970, pursuant to a judgment of possession recognizing the will, an undivided one-third interest in this naked ownership of the home passed to the trustees for each of the three trusts. Apparently, neither this judgment of possession nor the will was ever recorded in the Orleans Parish conveyance records.

On November 5, 1980, Loring reached the age of 25 and "requested that one-half of the trust's principal be distributed to him in accordance with this partial termination" under the terms of the trust. In accordance with his request and pursuant to a sworn receipt and release signed by Loring, the trustees then distributed to Loring certain shares of stock and a certain amount of cash; the trustees did not, however, expressly transfer to Loring in writing any interest in the home.

In 1984, the children's grandmother died and thus her usufruct over the home terminated. As each of the three children had attained the age of 25 by this time, each was entitled to receive from the two remaining trustees for his/her trust one-half of the trust's undivided one-third full interest in the home. According to the trustees:

One-half of each trust's one-third interest in the House was not distributed to [the three children] at that time because the Trustees and each of the beneficiaries desired to list the House for sale, and because they believed it would be easier to sell the House as a whole rather than attempting to arrange the sale among a number of different owners. Once the House was sold, the Trustees and the beneficiaries agreed that one-third of the proceeds from the sale would be deposited in each of the trusts, and that each trust would then distribute one-half of its respective interest in the sale proceeds (one-sixth of the total sale proceeds) to each beneficiary. Thereafter, each trust would distribute the remaining one-sixth interest in the sale proceeds to the trust's beneficiary when the beneficiary attained the age of 35, in accordance with the terms of the Will.

The record does not reveal whether any written documents were executed by either the trustees or any of the three children to memorialize this apparent understanding. For whatever reason, the home was not sold.

By March 1988, Loring's sister Katharine reached the age of 35 and thus her trust terminated in its entirety. By a written "Conveyance of Property," Katharine and the trustees "acknowledged and confirmed" the termination of her trust and the trustees conveyed to Katharine her trust's now undivided one-third full ownership interest in the home; this document was then recorded in the Orleans Parish conveyance records.

In April 1988, Katharine filed a petition in the Civil District Court for the Parish of Orleans for a definitive judicial partition of the home by licitation pursuant to Louisiana Civil Code articles 1289 *et seq.* Named as defendants were the trustees for the remaining two trusts, her brother and sister individually, and seven persons who "appear to be creditors claiming liens or judicial mortgages against the interest, if any, of defendant William Loring Ferguson III in the" home and "whose claims have been made known on the public records of Orleans Parish." These seven persons are

specifically the United States, on behalf of the Internal Revenue Service; Commander's Palace, Inc.; Galatoire's Restaurant, Inc.; Thomas A. Ogg III; Stotler and Company; Thomson–McKinnon Securities, Inc.; and Dr. Ted Reveley.

The United States removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a), 1444, and 2410(a)(3). On October 14, 1988, the Court granted unopposed summary judgment for a partition by licitation and ordered that the U.S. Marshal seize and sell the property and then deposit the proceeds into the registry for subsequent distribution by the Court. On March 30, 1989, the Marshal sold the home by auction for $185,000. On May 2, 1989, after deducting his costs, the Marshal deposited $182,210 into the registry. By separate unopposed motions, the Court has permitted Katharine on the one hand and the trustees for the benefit of Phoebe on the other to withdraw their respective undisputed one-third interest in these proceeds from the registry (viz., $60,736.67, plus accrued interest thereon).

Remaining in the registry is the final one-third interest for the benefit of Loring (viz., $60,736.66, plus accrued interest). Loring's trustees on the one hand and his creditors on the other are making competing claims to these proceeds. The trustees and two of the creditors have now moved the Court to determine the competing parties' respective right to the remaining proceeds and to distribute the proceeds accordingly.

## II.

By Minute Entry dated December 6, 1989, the Court ordered each of the creditors to submit various documents and sworn statements and advised the parties that the Court would treat failure to comply timely "as a voluntary abandonment by that person of his/its claim to any of the proceeds remaining in the registry." [1]

The record reveals the following about each creditor's claims against Loring.

1. *The United States:* The IRS filed notices of federal tax liens for unpaid taxes for the years 1982–1985. According to the government's answer to certain interrogatories propounded by another creditor, these tax liabilities have now been paid in full. Further, the government did not respond to the Court's December Minute Entry. Thus, the Court deems the United States to be making no remaining claim to any of the remaining proceeds.

2. *Galatoire's Restaurant, Inc.:* By an unsworn answer filed on September 25, 1989 in response to similar interrogatories, Galatoire's states that it obtained judgment in the First City Court of the City of New Orleans for the principal amount of $279.85 and that it is owed a total sum of $508.85 ($279.85 for principal, $100 for attorney's fees, $91 for court costs, and $38 for interest). It further appears that this judgment was recorded in the Orleans Parish Mortgage Records on January 23, 1984. Yet no formal appearance has been made by Galatoire's, nor is there a copy of its judgment in the record, nor does the record indicate whether any or all of this judgment has been satisfied, nor has Galatoire's responded to the Court's December Minute Entry. Thus, the Court likewise deems Galatoire's to be making no remaining claim to any of the remaining proceeds.

3. *Commander's Palace, Inc.:* On January 18, 1984, Commander's obtained judgment in the First City Court of the City of New Orleans:

> in the full sum of … $1,080.20, plus interest at the legal rate from the date of judicial demand until paid, reasonable attorney's fees in the amount of ONE–THIRD (33⅓%), and all costs of these proceedings.

This judgment was recorded in the Orleans Parish Mortgage Records on May 30, 1985. By affidavit, Commander's states that no portion of its judgment has been satisfied. Commander's computes the total amount due it as of December 31, 1989 under the judgment to equal $2,431.86 ($1,080.20 in principal, $360.07 in attorney's fees, and

---

1. *See generally* F.R.Civ.P. 16(b), 16(f), 37(b)(2)(B), 41(b); La.Civ.C. art. 1336.

$991.59 in interest from January 18, 1984).[2] According to the Court's own calculation, the total amount due as of May 2, 1989 equals $2,318.88.

4. *Thomas A. Ogg III:* On April 23, 1986, Ogg obtained a "consent judgment" in the Civil District Court for the Parish of Orleans for the principal amount of $26,-212.00, "inclusive of attorney's fees." The judgment contains absolutely no mention of or reference to interest of any kind, nor does the record reveal whether that action was one "sounding in damages 'ex delicto.' "[3] The judgment was recorded in the Orleans Parish Mortgage Records on April 30, 1986. By affidavit, Ogg states that no portion of his judgment has been satisfied. Ogg computes the total amount due him as of May 2, 1989 under his judgment to equal $34,943.47 ($26,212 in principal and $8,731.47 in postjudgment legal interest).[4]

■ Ogg errs, however, in presuming that he is entitled to post-judgment interest. Unlike federal law under 28 U.S.C. § 1961,[5] Louisiana state law prohibits, with the sole exception of judgments in tort actions, the recovery of interest in an action unless the judgment in the action so provides.[6] Because the instant consent judgment neither explicitly nor implicitly[7] provides for interest on the principal sum awarded in the judgment and because there is no evidence in the record that Ogg's action was a tort action,[8] the Court holds that Ogg is not entitled to recover from the registry proceeds any amount for legal interest on his judgment. Thus, the Court determines the total amount due Ogg as of May 2, 1989 under his judgment to equal $26,212.00.

On the afternoon before the instant motions were set for hearing, Loring finally chose to appear in this action—not to file an answer, but merely to file a 1½-page memorandum in support of the trustees' motion and argument that all the remaining registry proceeds should go to the trustees. Loring's memorandum states:

> In the proceedings entitled Thomas A. Ogg, III versus William Loring Ferguson, III, No. 83–4842 on the Docket of the Civil District Court for the Parish of Orleans, State of Louisiana, Judge Plotkin held that George Denegre and Richard B. Fox, in their capacity as Trustees, not William Loring Ferguson, III, were the owners of a one-third interest in the house. A copy of that judgment was attached and made a part of the Trustee's motion. Judge Plotkin's decision was affirmed by the Louisiana Court of Appeal for the Fourth Circuit in *Ogg v. Ferguson*, 521 So.2d 525 (La.App. 4th Cir.1988). This Court is required to give full faith and credit to the two Louisiana

---

2. Commander's provides neither the amount of its court costs nor the date of its judicial demand; further, Commander's calculations of the total amount of its claim does not include any amount for court costs or for prejudgment interest. The Court deems Commander's to have abandoned these additional amounts. *Cf. Vaughn v. Mobil Oil Exploration & Producing Southeast, Inc.,* 891 F.2d 1195, 1198 (5th Cir. 1990).

 Further, Commander's errs in its calculation of interest for the year 1984. Simple interest at 12% on a principal of $1,440.27 from January 18, 1984 through December 31, 1984 (348 days in a 366–day year) equals $164.33. Thus, the total as of December 31, 1989 should equal only $2,429.15.

3. La.R.S. 13:4203.

4. Ogg errs in his calculation of interest for the years 1986 and 1989. Simple interest at 12% on a principal of $26,212 from April 23, 1986 through December 31, 1986 (252 days) equals $2,171.65; simple interest at 11.5% on the same principal from January 1, 1989 through May 2, 1989 (122 days) equals $1,007.55. Thus, if Ogg were entitled to postjudgment legal interest, the total amount due him as of May 2, 1989 would be $35,092.31.

5. *See Moore–McCormack Lines, Inc. v. Amirault,* 202 F.2d 893, 895 (1st Cir.1953) (citing *Blair v. Durham,* 139 F.2d 260, 261 (6th Cir.1943)); *see also In re Incident Aboard the D/B Ocean King,* 877 F.2d 322, 325 (5th Cir.1989).

6. *See Davis v. LeBlanc,* 149 So.2d 252, 253 (La. App. 3d Cir.1963) (Tate, J.); *accord Spalitta v. Silvey,* 526 So.2d 471, 473 n. 2 (La.App. 1st Cir.), *writ denied,* 532 So.2d 115 (La.1988).

7. *See Brown v. Mitchell Homes,* 520 So.2d 1234, 1235–36 (La.App. 5th Cir.1988).

8. By telephone, counsel for Ogg represented to the Court that Ogg's state court action was in fact not a tort action, but an action on a promissory note.

Court's [sic] decisions which are final. Although the asset (the house) has now been transformed to cash, the ownership has not changed. Just as Mr. Ogg was not entitled to seize the house, he is not entitled to seize the proceeds from the sale of the house because they belong to the Trustees. The same applies to the other parties who have laid claims to the funds.

Contrary to his memorandum, the trustees have not filed a copy of any such district court judgment, nor has Loring submitted a copy of that judgment or any other evidence in support of his position.

5. *Stotler and Company:* On July 10, 1984, it obtained judgment in the United States District Court for the Northern District of Illinois for the principal sum of $26,060.98, together with interest "at the annual rate of 9% beginning January 1, 1983 until paid." The judgment was made executory in this Court, *see* Miscellaneous Action No. 1387 "B"(5), and was later recorded in the Orleans Parish Mortgage Records on June 12, 1986. The record in the miscellaneous action reveals that a car of Loring's was seized and sold by the U.S. Marshal for $4,200; by affidavit, Stotler represents that this entire $4,200 amount was paid to it on July 24, 1986 and that no more of this judgment has ever been satisfied. The total amount due Stotler as of May 2, 1989 under its judgment equals $35,669.85 ($21,860.98 in principal and $13,808.87 in interest).[9]

6. *Thomson–McKinnon Securities, Inc.:* On December 2, 1987, it obtained judgment in the First City Court of the City of New Orleans:

> in the full sum of ... $1,719.21 ..., together with legal interest thereon from the date of judicial demand, until paid, attorney's fees of TWENTY–FIVE (25%) PERCENT of the principal plus interest, and for all costs of these proceedings.

By affidavit, Thomson–McKinnon states that no portion of its judgment has been satisfied. It computes the total amount due as of May 2, 1989 under its judgment to equal $2,713.58 ($1,719.21 in principal; $285.65 in legal interest from date of judicial demand, September 31 [sic], 1987, through May 2, 1989; $501.22 in attorney's fees; and $207.50 in court costs). This judgment was recorded in the Orleans Parish Mortgage Records on January 20, 1988.[10]

7. *Dr. Ted Reveley:* According to his answer, he obtained a judgment on August 23, 1983 and subsequently recorded it in the Orleans Parish Mortgage Records. The record does not reveal, however, the amount of the judgment, the date it was recorded in the mortgage records, or whether any portion of it has been satisfied. Further, Dr. Reveley did not respond to the Court's December Minute Entry. Thus, the Court deems him to be making no remaining claim to any of the remaining proceeds.

### III.

While none of the parties raises the issue, the Court sua sponte addresses whether it has subject matter jurisdiction

9. Stotler erroneously computes interest based on a 360-day year. The Court calculates the interest as follows:

| | | |
|---|---|---|
| 1983: | ($26,060.98) · (9%) | = $2,345.49 |
| 1984: | ($26,060.98) · (9%) | = $2,345.49 |
| 1985: | ($26,060.98) · (9%) | = $2,345.49 |
| 1/01/86–07/24/86: | ($26,060.98) · (9%) · (205/365) | = $1,317.33 |
| 7/25/86–12/31/86: | ($21,860.98) · (9%) · (160/365) | = $ 862.46 |
| 1987: | ($21,860.98) · (9%) | = $1,967.49 |
| 1988: | ($21,860.98) · (9%) | = $1,967.49 |
| 1/01/89–05/02/89: | ($21,860.98) · (9%) · (122/365) | = $ 657.63 |
| | TOTAL | = $13,808.87 |

10. Because, as explained in Part V(B) below, the Court finds that Thomson–McKinnon is entitled to none of the registry proceeds, the Court need not (and at present cannot) determine if the figures for interest (and thus also for attorney's fees) and for costs are correct.

over the remaining disputes now that the United States has apparently been paid.

At the time Katharine filed her petition for partition by licitation, the United States was asserting a federal tax lien over any interests that Loring may have had in the home and it was disputed between Loring and the trustees on the one hand and Loring's creditors including the United States on the other whether, under Louisiana law, Loring personally held any interest in the home. Thus, pursuant to 28 U.S.C. § 2410(a)(3), the state court had subject matter jurisdiction to adjudicate the claims by or against the United States.[11]

The Fifth Circuit has noted that 28 U.S.C. "§ 1444 confers a *substantive* right to remove, independent of any other jurisdictional limitations,"[12] state court actions brought, at least in part, under 28 U.S.C. § 2410. The United States exercised this statutory right by removing the action to this Court and thereby conferring this Court with subject matter jurisdiction over at the least the claims by or against the United States.

It is a separate question whether the jurisdictional statutes applicable in this action—28 U.S.C. §§ 1444 and 2410—confer upon this Court the statutory power to address the remaining claims by and among the other parties. In marked contrast to federal jurisdictional-conferring statutes such as 28 U.S.C. § 1346(b) of the Federal Tort Claims Act, the jurisdictional statutes applicable here contemplate that "the presence of a claim against the United States constitute[s] merely a minimum jurisdictional requirement"[13] and that claims may be asserted against persons other than the United States. Under these two statutes, then, a federal court has the statutory power to address pendent-party state-law claims—provided, of course, that these pendent-party claims meet the constitutional requirements under Article III that both the federal and state claims arise from a common nucleus of operative facts.[14]

In this action, there has never been a dispute about the validity of any of the judicial mortgages, but only about the applicability of those mortgages to the home and now to the remaining registry proceeds; the disputes uniformly turn around the interpretation of the testamentary trust instrument and the various agreements and documents made pursuant thereto.[15] Thus, it is evident that all the claims arise from a common nucleus of operative facts. Hence, the Court has both the constitutional and statutory power to address the pendent-party state-law claims in this action.

Nor has the Court lost this power now that the claims concerning the United States have, since the filing of removal petition, become moot by reason of the payment of the federal tax liens at issue. Where as here the claims concerning the United States were not "insubstantial in a

---

11. *Cf. Cummings v. United States,* 648 F.2d 289, 292 (5th Cir. Unit A 1981) (state court lacked subject matter jurisdiction under 28 U.S.C. § 2410 "where the United States claims not a security interest but title to the property").

12. *City of Miami Beach v. Smith,* 551 F.2d 1370, 1374 n. 5 (5th Cir.1977) (emphasis in original).

13. *See Finley v. United States,* —— U.S. ——, 109 S.Ct. 2003, 2008, 104 L.Ed.2d 593 (1989).

14. *Compare Miller v. Griffin–Alexander Drilling Co.,* 873 F.2d 809, 814 (5th Cir.1989) (post-*Finley* dictum that federal courts have power and discretion to assert pendent-party jurisdiction in an admiralty case) *with Henry v. Independent American Savings Ass'n,* 857 F.2d 995, 999 & n. 23 (5th Cir.1988) (collecting cases recognizing pendent-party jurisdiction). *See generally United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

15. Unlike other creditors of a trust beneficiary to a spendthrift trust, *cf. infra* pp. 1050–1051, the United States may assert a lien directly against such trust property pursuant to 26 U.S.C. § 6321 notwithstanding La.R.S. 9:2004(1). *See Jackson v. D'Aubin,* 316 So.2d 478, 481–82 (La.App. 1st Cir.1975) (citing *United States v. Dallas National Bank,* 152 F.2d 582, 585 (5th Cir.1945) (concerning a similar Texas spendthrift trust)), *aff'd on other grounds,* 338 So.2d 575 (La.1976); *see also Dallas National Bank v. United States,* 167 F.2d 468, 469 & n. 7 (5th Cir.1948) (Holmes, J., concurring). Nonetheless, the security rights of the United States, like those of Loring's other creditors, still turn on the interpretation of the will within which the trust instrument is found, for it is through this will that Loring purportedly obtained his interest in the home. *See* cases cited below in note 32.

jurisdictional sense" at the time of removal, the Court still retains the power and discretion to rule on any remaining state law claims,[16] albeit that the Court's discretion weighs less heavily in favor of deciding the pendent claims once the federal claims are dismissed.[17]

No party has objected to this Court's exercising pendent-party jurisdiction over the state-law claims, and all the parties have already addressed what they perceive to be all the issues and facts in the action. Further, the Court has peculiarly strong interests in retaining jurisdiction for disputes over proceeds in its registry, especially where as here those proceeds were placed in the registry pursuant to a Court order made at a time apparently before the United States' claim to those proceeds became moot.[18] In this instance, the Court exercises its discretion to decide the pendent-party state-law claims.

## IV.

The Court next addresses and rejects Loring's eleventh-hour, full-faith-and-credit argument. The Court explains.

### A.

Loring's argument asserts what is in essence an affirmative defense of res judica-ta. Both F.R.Civ.P. 8(c) [19] and La.C.Civ.P. art. 927(2) [20] require that a party specifically assert this defense in his pleadings in order to have the court consider the defense. In this case, Loring has filed no pleadings of any kind—much less either a peremptory exception before this matter was removed to federal court or an answer or a Rule 12(b)(6) motion once the matter was removed to federal court. Cognizant of the peculiarities of licitation and similar interpleader/concursus-type proceedings such as this one, however, the Court nonetheless addresses the merits of Loring's defense.[21]

Under 28 U.S.C. § 1738, the-full-faith-and-credit statute, federal courts are obliged "to give the same preclusive effect to a state-court judgment as would the courts of the State rendering the judgment." [22] A federal court must "look first to state preclusion law in determining the preclusive effects of a state court judgment," [23] but is not to "give greater deference to a state court judgment than a court of the state in which the judgment was rendered would give it." [24] Thus, this Court must turn to the Louisiana law.

To quote from a recent Fifth Circuit opinion:

**16.** *See Rosado v. Wyman,* 397 U.S. 397, 402–05, 90 S.Ct. 1207, 1212–14, 25 L.Ed.2d 442 (1970); *see also Brunswick v. Regent,* 463 F.2d 1205, 1206–07 (5th Cir.1972) (per curiam) (federal district court retained jurisdiction to decide state law claims where the plaintiff indicated at the final pretrial conference that he would not be pursuing his federal claims).

**17.** *See generally Joiner v. Diamond M Drilling Co.,* 677 F.2d 1035, 1041–44 (5th Cir.1982) (discussing the discretion in deciding ancillary third-party claims in an admiralty action, where the main claims had been settled).

**18.** *Cf. Grimes v. Chrysler Motors Corp.,* 565 F.2d 841, 843–44 (2d Cir.1977) (per curiam) (federal district court did not abuse its discretion in ordering that settlement funds in a diversity case be deposited in the registry for court-directed distribution, where the plaintiffs and their two attorneys (all citizens of New York) disputed the proper distribution of these funds among themselves).

**19.** *Barker v. Norman,* 651 F.2d 1107, 1130 (5th Cir. Unit A 1981).

**20.** *See Mara v. Mara,* 452 So.2d 329, 331 (La. App. 4th Cir.1984); *Bielkiewicz v. Rudisill,* 201 So.2d 136, 139 (La.App. 3d Cir.1967) (Tate, J.).

**21.** *Cf. American Furniture Co. v. International Accommodations Supply,* 721 F.2d 478, 482 (5th Cir. Unit A 1981). *See generally Simon v. United States,* 891 F.2d 1154, 1157 (5th Cir.1990) ("Failure to comply with Rule 8(c) usually results in a waiver. If, however, a defendant raises the issue at a 'pragmatically sufficient time,' and if the plaintiff is not prejudiced in its ability to respond, there is no waiver of the defense." (citations omitted)).

**22.** *McDonald v. City of West Branch, Michigan,* 466 U.S. 284, 287, 104 S.Ct. 1799, 1801, 80 L.Ed.2d 302 (1984).

**23.** *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 381, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985).

**24.** *Gauthier v. Continental Diving Services, Inc.,* 831 F.2d 559, 561 (5th Cir.1987); *see also Reimer v. Smith,* 663 F.2d 1316, 1325 (5th Cir.1981) (collecting cases).

**1048**

Louisiana principles of res judicata, derived as they are from the civil law, have a smaller grasp than their common law counterparts. A Louisiana court will give res judicata effect to a final judgment only if there is: (1) an identity of the parties, (2) an identity of the cause, and (3) an identity of the thing demanded. Doubts are resolved in favor of subsequent litigation. Moreover, Louisiana does not recognize the common law doctrine of collateral estoppel.[25]

The second element, "cause," is the "juridical or material fact which is the basis of the right claimed."[26] In determining the identity of the "thing demanded," the second court "should determine what were the matters actually litigated and decided" in the first court and whether "the object of both suits be the same."[27]

### B.

The earlier judgment upon which Loring relies concerns certain postjudgment, enforcement proceedings in Ogg's original state court case against Loring. While the parties have submitted no transcripts, pleadings, or orders from the trial court, the following may be gleaned from the published opinion of the Louisiana Court of Appeal for the Fourth Circuit, which affirmed the trial court's judgment on those enforcement proceedings.[28]

Sometime after he obtained the consent judgment from Loring, Ogg requested a writ of fieri facias ordering the sheriff to seize the Fergusons' family home, in which Loring was living, for judicial sale. In response, Loring moved for a temporary restraining order, permanent injunctive relief, attorney's fees, and damages and pleaded that he owned a one-sixth undivided interest in the home. That same day, Ogg requested that the sheriff limit the seizure to this one-sixth undivided interest

in the property. The next day, the trustees intervened, also seeking to enjoin the seizure and sale and requesting attorney's fees and damages; the trustees alleged that title to the property was solely in their names. Asserting an error of fact, Ferguson then amended his petition to withdraw his claim of ownership. At some point the trial court apparently granted the writ, for at a pretrial conference Ogg requested that the writ be recalled and the property released from seizure. Loring and the trustees, however, persisted in their claims for damages and attorney's fees. After a hearing, the trial court "found that the seizure was wrongful" and ordered Ogg to pay Loring and the trustees each attorney's fees and nominal damages.[29]

Ogg appealed, raising four arguments: (1) Ogg was entitled to rely on the Orleans Parish public records, which did not include a copy of the 1970 judgment of possession to the trustees; (2) Loring made a judicial confession and otherwise represented that he owned a one-sixth undivided interest in the home; (3) the award was improper inasmuch as Ogg acted in good faith; and (4) Loring is not entitled to an award if he claims no interest in the property at issue. Rejecting each argument, the Fourth Circuit affirmed. Apparently, no review was taken to the Louisiana Supreme Court.

While the Fourth Circuit's opinion addresses Louisiana's doctrine concerning third-party notice of immovable property conveyances and encumbrances, it does not discuss the separate issue *why* Ogg's attempted seizure was wrongful or the separate issue of title as between the trustees and Loring. Specifically, it does not address whether, in fact, Loring personally held an interest in the home inasmuch as he was over the age of 25 and his trust provided that one-half of the trust property, which included a one-third interest in

25. *Lewis v. East Feliciana Parish School Board,* 820 F.2d 143, 146 (5th Cir.1987) (citations omitted) (discussing La.R.S. 13:4231 (formerly codified as La.Civ.C. art. 2286)).

26. *Hernandez v. City of Lafayette,* 699 F.2d 734, 736 (5th Cir.1983) (per curiam) (quoting *Mitchell v. Bertolla,* 340 So.2d 287, 291 (La.1976)).

27. *Lewis,* 820 F.2d at 148 (citing *State ex rel. Guste v. City of New Orleans,* 363 So.2d 678, 681 (La.1978)).

28. *Ogg v. Ferguson,* 521 So.2d 525 (La.App. 4th Cir.1988).

29. *Id.* at 527–28.

the home, be distributed to him at the age of 25. Nor is there any indication whether the parties actually raised this issue or whether the trial court below addressed this issue.

### C.

■ As to Commander's, Stotler, and Thomson–McKinnon, there can be no doubt that the defense of res judicata is inapplicable inasmuch as none of these three creditors was a party to the earlier case described above, upon which Loring relies.

■ As to Ogg, resolution of Loring's defense is not as simple, for it is undisputed that there is an identity of the relevant parties—Ogg, Loring, and the trustees—in the earlier and instant actions. The issue, then, is whether there is an identity of "cause" and "thing demanded" between the two actions. The Court determines there is not.

On the one hand, in the earlier action, the state courts addressed whether Ogg had the right to seize the home; in the instant action, however, Ogg did not attempt to seize the home, and Katharine's motion for summary judgment to have the Marshal seize and sell the home was unopposed. On the other hand, in the first action, Ogg voluntarily withdrew his claims for relief, and it was Loring and the trustees who continued to pursue any claims for damages; in this case, however, Loring and the trustees are not making claims for damages against Ogg or anyone else, and Ogg is pursuing a claim ultimately against these two.

Further, the two actions contain a significant factual difference, which, as discussed further in Part V(B) below and notwithstanding Loring's unsupported suggestion to the contrary, the Court finds to be legally significant as well. In the earlier action, the property at issue was at all times an immovable; in the instant action, however, the property at issue, by reason of the judicial partition and sale, has been transformed into movable property in the form of registry proceeds. The Fourth Circuit opinion noted the agreement between the trustees and Loring concerning his one-sixth interest in the home *after* any sale of the home; the opinion did not, however, suggest or purport to imply whether, notwithstanding this agreement, Ogg and Loring's other creditors holding judicial mortgages would not be entitled to assert their mortgages against any sales proceeds; the opinion was wholly silent on the relationship of the trust instrument, this agreement, and any sale of the home. In sum, then, the Court can find neither an identity of cause or an identity of thing demanded.

Thus, the Court must reject Loring's defense of res judicata and address the merits of the parties' competing claims to the proceeds.

### V.

Below, the Court addresses the merits of who among the parties is entitled to what portion of the registry proceeds.

### A.

■ When a federal court is *Erie*-bound [30] to apply state law by reason of diversity jurisdiction, the court must follow intermediate appellate state court opinions in determining state law, where there is no "persuasive data" that the state supreme court would hold to the contrary.[31] While here the Court does not have diversity jurisdiction, the Court nonetheless is to apply state law under 28 U.S.C. § 2410(c) and 26 U.S.C. § 6323 for determining Loring's legal interests in the property at issue and the competing rights of the nonfederal

---

**30.** *See Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**31.** *Compare Taylor v. Jim Walter Corp.,* 731 F.2d 266, 267 (5th Cir.1984) ("We are bound by the decisions of the [Louisiana] state intermediate appellate courts ... absent a 'strong showing' that the Louisiana Supreme Court would hold to the contrary.") *with Wood v. Armco, Inc.,* 814 F.2d 211, 213 n. 5 (5th Cir.1987) ("The decision of an intermediate appellate state court guides, but is not necessarily controlling upon, the federal court when determining what the applicable state law is.").

parties to any interest Loring may hold;[32] by analogy, then, this Court must look to Louisiana state court opinions in the same manner as under *Erie*.

In this case, however, the Louisiana Fourth Circuit expressed no opinion in *Ogg v. Ferguson* on the issue of who between Loring and his trustees owned the one-sixth undivided interest in the home; one may infer at most that the Fourth Circuit and the parties alike implicitly presumed for purposes of the appeal that Loring personally in fact owned no interest in the property.[33] Thus, even assuming that this issue of prior ownership in the home is controlling of the issues before this Court now that the home has been sold, the Fourth Circuit's opinion provides no binding, or even persuasive, authority. This Court must thus look elsewhere—to the Civil Code, Louisiana statutes, and other Louisiana state court opinions—in order to resolve the controlling issues remaining before this Court.

### B.

The Court must first determine the ownership interest in these proceeds as between Loring and his trustees. As explained below, any proceeds owned by Loring personally are subject to seizure by his creditors, but any proceeds owned by the trustees on behalf of Loring's trust are immune from any such seizure.

Under the Louisiana Trust Code,[34] a "trust instrument may provide that the interest of a beneficiary shall not be subject to voluntary or involuntary alienation by a beneficiary."[35] Trusts that restrict alienation to this full extent, such as the instant trust, are known as "spendthrift trusts."[36] Section 2004 of the Trust Code provides that "[a] creditor may seize only:

(1) An interest in income or principal that is subject to voluntary alienation by a beneficiary; and

(2) A beneficiary's interest in income and principal, to the extent that the beneficiary is a settlor of the trust."

Section 1761 provides:

A settlor is a person who creates a trust. A person who subsequently transfers property to the trustee of an existing trust is not a settlor.

According to this section, then, Loring is not a settlor inasmuch as it was his father, and not he, who created the trust; thus, section 2004(2) does not apply. Similarly, because the trust is a spendthrift trust, section 2004(1) does not apply either. Thus, Loring's creditors have no right under Louisiana law to seize whatever property may be part of his trust.

Because Loring has not yet reached the age of 35, it is both clear and apparently undisputed that at least half of "his" one-third interest in the home was—and now at least half of the remaining proceeds in the registry is—the property of the

---

**32.** *See Sgro v. United States,* 609 F.2d 1259, 1260 (7th Cir.1979); *cf. Estate of Johnson,* 836 F.2d 940, 945 n. 13 (5th Cir.1988) (directing the district court to look to state law on the issue of whether a decedent's estate had a security interest for administration and funeral expenses in order then to determine whether any such interest primes the United States' interest in property on which the United States had asserted federal tax liens); *Randall v. H. Nakashima & Co.,* 542 F.2d 270, 272 (5th Cir.1976) ("state law determines whether the taxpayer [viz., Loring] has property or the right to property to which the tax lien may attach"); *United States v. Dallas National Bank,* 152 F.2d 582, 584 (5th Cir.1945) (state law determined whether a taxpayer who was a beneficiary under a spendthrift testamentary trust had been given any property or rights thereto in the trust that might be subjected to a federal tax lien); *Jackson v. D'Aubin,* 338 So.2d 575, 577 (La.1976) (citing *Aquilino v. United*

*States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960)).

**33.** Such an inference itself, however, may be dubious. As mentioned, the Fourth Circuit opinion gives no indication exactly why the attempted seizure was wrongful. For all this Court can tell, the state trial court may have found that Ogg's actions were improper because he failed to join Commander's and Stotler, among others of Loring's creditors who have recorded judicial mortgages in Orleans Parish, as indispensable parties. *Cf. Sutton v. Sutton,* 320 So.2d 597, 599 (La.App. 4th Cir.1975) (discussing La.Civ.C. art. 1338).

**34.** La.R.S. 9:1721–2252.

**35.** *Id.* § 2002.

**36.** *See id.* § 1725(7); *cf. id.* § 2007.

trustees on behalf of the trust.[37] It follows that at least half of the proceeds remaining in the registry (i.e., at least $30,-368.33, plus accrued interest) should be distributed to the trustees.[38] At issue is how to characterize the remaining half of the registry proceeds.

■ Under section 1831(1) of the Trust Code, a testamentary trust that stipulates a term terminates (with two inapplicable exceptions) upon the earlier of (1) the termination date set forth in the trust instrument and (2) the death of the last surviving income beneficiary. Section 2029 provides for the effect of termination:

A termination of a trust causes the dispositive provisions of the trust to achieve their ultimate effect. A partial termination of a trust causes some of the dispositive provisions to achieve their ultimate effect.

In other words, where as here a trust instrument provides that a beneficiary under the trust shall receive certain property in the trust corpus on a specified date, there is no legal requirement that the trustee formally execute a document of conveyance of this property interest in order for the transfer to be effective as between the trustee and the beneficiary; instead, on the specified date, the property automatically passes by operation of law from the trustee to the beneficiary.[39] Applying these general rules to the instant trust, the Court finds as a matter of law that when Loring reached the age of 25 in 1980, Loring automatically obtained in his own name an undivided one-sixth naked interest in the home; that Loring's trustees did not need to execute any formal written document in order to effect this transfer; and that in 1984 when his grandmother died, this naked interest automatically became an undivided one-sixth full ownership interest in the home.

■ But the issue does not end with this conclusion, for section 1931 of the Trust Code permits property to be added to a trust, where as here the trust instrument does not provide to the contrary. In this instance, however, two reasons support the conclusion that this one-sixth full ownership interest never was added back to the trust.

On the one hand, section 1935 provides that "[a]n. addition of property to an existing trust by donation inter vivos is effective upon acceptance by the trustee." Section 1932 further provides:

An addition of property to an existing trust must be made in one of the forms required for the making of a donation of the same type free of trust. A trustee's acceptance shall be in writing.

Under Civil Code article 1536, a donation inter vivos of immovable property must be

---

37. While the trustees apparently failed to record either the testamentary trust or the judgment of possession in the Orleans Parish conveyance records notwithstanding the Trust Code's requirements in La.R.S. 9:2092, such was not required under Louisiana law inasmuch as the trust was a testamentary trust and the property at issue, the home, was among the donations mortis causa that the testator made to the trusts. *See Jackson,* 338 So.2d at 580.

38. Noting that Loring will become 35 years old in November 1990, at which time Loring's entire trust will terminate, Stotler and Ogg have suggested that the Court not distribute any proceeds until then. They do not, however, cite— and the Court has found no—authority that would give the Court the power and discretion to delay in distributing property to a person the Court determines is the rightful owner of that property. Such action might well violate the takings clause of the Fifth Amendment and, in any event, rests on the dubious presumption that the trustees could not invest the proceeds at a higher rate of return than the low passbook savings rate (viz., 5½%) that the proceeds are presently earning in the registry pursuant to Local Rule 24.01E.

39. The Court expresses no opinion on the separate issue of effecting a valid transfer *to the prejudice of* any third parties, where as here there is no allegation or claim of third-party prejudice. *Cf. Jackson,* 338 So.2d at 580 (discussing former La.Civ.C. art. 2266 (redesignated as La.Civ.C. art. 1837)). The Court also notes that there may be other, valid reasons why a trustee or a beneficiary may wish to have a formal writing acknowledging the transfer (e.g., to help maintain merchantable title of any immovable property that is so transferred or to help avoid future argument between a trustee and a beneficiary as to the trustee's administration of property remaining in the trust or as to whether the trustee distributed a correct amount of property).

by authentic act (i.e., must be "passed before a notary public and two witnesses"). Because the one-sixth interest in the home constitutes an interest in an immovable and because the record reveals neither an authentic act of conveyance nor a written acceptance by the trustees, the Court must conclude that Loring never effected any possible retransfer of his one-sixth interest back to the trustees.

On the other hand, the apparently-oral agreement among the trustees, Loring, and his two sisters provided that one-half of each child's beneficial interest in any sales proceeds would be distributed to that child upon the sale. This agreement evinced an intent that each of the three one-sixth interests in the home nominatively held by the trustees for resale/convenience purposes would, unlike the original property in the trusts, be voluntarily alienable by the trust beneficiaries; in other words, the agreement purported to be an act of mandate giving the trustees, not as trustees but as mandatories under Civil Code articles 2985–3034, the power of attorney to sell each child's interest in the home. Thus, to the extent the trustees could be deemed to have retained title in the one-half interest to which Loring was entitled at age 25, such interest was not exempt from seizure by Loring's creditors by reason of section 2004 of the Trust Code.

In sum, then, the remaining half of the registry proceeds are subject to seizure by Loring's creditors. As explained below, Loring should receive none of these remaining proceeds and instead his creditors remaining before the Court (viz., Commander's Palace, Inc.; Thomas A. Ogg III; Stotler & Co.; and Thomson–McKinnon Securities, Inc.) should be paid this entire amount in the order of their rank and priority.[40]

Louisiana Civil Code article 3183 provides:

> The property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors some lawful causes of preference.

Under article 3184, the two lawful causes of preference are mortgages, including judicial mortgages,[41] and privileges.

All four creditors still before this Court hold judicial mortgages, and no other form of preference is alleged by any creditor. Civil Code article 3321 provides:

> The *judicial* mortgage is that resulting from judgment [judgments] (whether these be rendered on contested cases or by default, or whether they be final or provisional), in favor of the person obtaining them.

Emphasis, brackets, and parentheses in original. Under article 3322, a "judicial mortgage takes effect from the day the judgment is recorded" in pertinent parish's mortgage records office. Finally, article 3397(3) provides that a mortgage has the effect:

> That the mortgagee has the benefit of being preferred to the mere chirographic or personal creditors, and even to the other mortgagees who are posterior to him in the date of the registry of their mortgages.

In sum, then, Loring's half of the registry proceeds should be paid out to his creditors in the order of the recordation of their judgments in the Orleans Parish Mortgage Records.

The Court summarizes the four remaining creditors' claims against Loring as of May 2, 1989, the date the Marshal deposited the sale proceeds into the registry:

| | | |
|---|---|---|
| 1. Commander's Palace, Inc. | $2,318.88 | 5/30/85 |
| 2. Thomas A. Ogg III | $26,212.00 | 4/30/86 |
| 3. Stotler & Company | $35,669.85 | 6/12/86 |
| 4. Thomson–McKinnon Securities | $2,713.58 | 1/20/88 |

Because Loring's one-half interest in the remaining proceeds equals a principal amount of only $30,368.33, it is evident that only the first three creditors, who have the oldest validly recorded judicial mortgages, may enjoy any portion of this money. Specifically, Commander's is entitled to $2,318.88 to satisfy its entire claim, Ogg is

---

**40.** *See generally* La.Civ.C. art. 1338.

**41.** *See id.* art. 3286.

entitled to $26,212.00 to satisfy his entire claim, and Stotler is entitled to the remaining $1,837.45.

 While state law governed the accrual of interest on the judgments up to May 2, 1989 (the date the Marshal deposited the sales proceeds into the registry), federal law governs the distribution of the interest that has accrued in the registry.[42] The Court has found, however, no authority on this subsidiary issue of what the federal law holds. Thus, the Court applies general principals of equity and common sense. On May 2, 1989, any of these three creditors (Commander's, Ogg, or Stotler) could have moved for immediate disbursement of the remaining proceeds; had they done so, there would not yet have been any accrued interest. On the one hand, to the extent their judgments earn interest at a higher rate than the passbook rate at which the registry proceeds are earning interest, then it is unfair to permit these creditors to delay in asking for the proceeds in an effort to receive a greater sum to the relative prejudice of Loring's other creditors.[43] On the other hand, interest earned on a principal sum of money that a person owns becomes, absent an express agreement to the contrary, the property of that person as well.[44] In sum, then, the Court holds that each of these three creditors is entitled to all accrued "passbook" interest on the principal sums set forth above.

## VI.

For these reasons, the Court holds that George Denegre and Richard B. Fox as

trustees of the Trust of William L. Ferguson Jr. for the benefit of William Loring Ferguson III are entitled to the principal sum of $30,368.33, plus all accrued interest thereon; that Commander's Palace, Inc. is entitled to the principal sum of $2,318.88, plus all accrued interest thereon; that Thomas A. Ogg III is entitled to the principal sum of $26,212.00, plus all interest accrued thereon; that Stotler & Company is entitled to the principal sum of $1,837.45, plus all interest accrued thereon; and that the remaining parties are entitled to no money in this action.

Upon these parties' compliance with Local Rule 24.03 and subject to the 10–day delay from the entry of this Order and Reasons as provided for in F.R.Civ.P. 62(a), the Court shall direct the Clerk of Court to disburse the remaining registry funds in accordance with this Order and Reasons.

---

**42.** *Cf. Chapman & Cole v. Itel Container International B.V.*, 865 F.2d 676, 689 (5th Cir.) (discussing 28 U.S.C. § 1961), *cert. denied sub nom. Urquhart & Hassell v. Chapman & Cole*, —— U.S. ——, 110 S.Ct. 201, 107 L.Ed.2d 155 (1989).

**43.** The Court illustrates. If the registry proceeds had been distributed on May 2, 1989, then Commander's would have received exactly $2,318.88. The interest earned in the registry on that sum is 5½% per year, or approximately 34.9¢/day; the legal interest under its judgment during the year 1989, however, was 11½% per year on $1,440.27, or approximately 45.4¢/day. Thus, if interest due under the judgment were calculated as of the date the money is with-

drawn from the registry (or as of the date Commander's moved for withdrawal of funds from the registry), and not as of the date the money was deposited into the registry, then, for each day Commander's delayed in seeking to obtain its share of the registry proceeds, Commander's would be receiving an extra 12.5¢/day that could have otherwise been available to pay off Loring's junior creditors.

**44.** *See, e.g., Amiss v. State*, 340 So.2d 1085, 1088 (La.App. 1st Cir.1976) (discussing La.Civ.C. arts. 498, 499, 545 (now codified as La.Civ.C. arts. 482, 483, 551)).